IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIMBERLY LYONS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA AND | : | |
| SHANE DARDEN | : | NO. 06-5195 |

MEMORANDUM

**Padova, J.**                                                                                                   **October 12, 2007**

Plaintiff Kimberly Lyons, a Philadelphia Police Officer, has brought this action pursuant to 42 U.S.C. § 1983 against the City of Philadelphia (the "City") and Shane Darden, also a Philadelphia Police Officer, stemming from an incident involving the two officers at Olney High School in Philadelphia, Pennsylvania on January 11, 2006. Plaintiff asserts a claim for excessive use of force against Darden, and a related Monell claim against the City. Plaintiff's Monell theory of liability is that the City has a policy and practice of ignoring systemic deficiencies in the internal investigatory and disciplinary mechanism of the Philadelphia Police Department (the "PPD"), and that these systemic deficiencies resulted in inadequate training, supervision, and disciplining of Darden and ultimately led to his use of excessive force against Plaintiff. Currently before us is the City's Motion for Summary Judgment pertaining to all of Plaintiff's claims against it. After oral argument on October 4, 2007, and for the reasons stated below, the Motion is denied.

**I.     BACKGROUND**

The following facts are taken from the parties' submissions.

         A.     The Incident at Olney High School

On January 11, 2006, at approximately 8:00 a.m., Police Officer Shane Darden ("Darden") was inside the City's 35th Police District building speaking with other officers regarding a jacket that

Police Officer Brian Wiercinski had borrowed and not returned. (Def. SMF ¶¶ 1-2.) Plaintiff Kimberly Lyons ("Plaintiff" or "Lyons"), who was Wiercinski's partner, participated in the conversation with Darden. (Def. SMF ¶¶ 1-2; Def. Ex. B at 2.) Lyons then left the 35th District building and went to her post at Olney High School, where she and Wiercinski were assigned security responsibility. (Def. Ex. B at 2; Def. SMF ¶ 5.)

Darden and his partner, Joel Fredericks, were assigned to the truant squad and Five Squad and were detailed to the Olney area as school truant/security officers. (Def. SMF ¶¶ 6-7.) At approximately 2:00 p.m., Darden and Fredericks, also went into Olney High School. (Def. SMF ¶ 8.) Darden testified in his deposition that Lyons invited him and his partner into the school that day. (Darden Dep. Tr. at 37:8-10.) Lyons, however, maintains that Darden used his authority as a Philadelphia Police Officer to enter the school and its security room when he was not assigned to be in either location. (Lyons Aff. ¶ 3.) Darden and Wiercinski had a brief conversation inside the school about the jacket. (Def. SMF ¶ 9.) After that conversation ended, Darden and Lyons spoke inside the security office. (Def. SMF ¶ 10.) The parties disagree as to what happened next. The City asserts that the conversation between Darden and Lyons in the security office quickly deteriorated, and that Darden left the security office followed by Lyons. (Def. SMF ¶¶ 10-11.) The City further asserts that in the hallway, the verbal dispute escalated into a physical altercation. (Def. SMF ¶¶ 11-12.) On the other hand, Lyons maintains that, without any cause or justification, Darden became verbally abusive, attacked, struck and choked her, and threw her into a wall, causing her to sustain serious injuries. (Lyons Aff. ¶ 3.) Lyons also contends that during the altercation, when bystanders tried to intervene and prevent Darden from attacking her, Darden declared: "Don't touch me, I'm a cop," and after he was moved away, he continued his attack and stated: "Get out of my

2

way, I'm a cop." (Id.) Lyons maintains that she then sustained additional injuries. (Id.) The parties agree that portions of the confrontation were seen and/or heard by numerous students, faculty, security and police officers. (Def. SMF ¶ 14.) The physical confrontation ended when other officers were able to physically separate Darden and Lyons. (Def. SMF ¶ 15.)

Internal Affairs performed an investigation of the incident. (Def. SMF ¶ 32.) As a result of the investigation, the allegations of assault against both officers were sustained and both officers were found to have committed Departmental violations by acting unprofessionally and fighting while on duty. (Id.) Internal Affairs also found that Darden "precipitated this conflict by appearing at Olney High School with no legitimate reason to do so, thus provoking the confrontation." (Def. SMF ¶ 33.)

### B. The Internal Affairs Investigatory and Disciplinary Process

The review process of the Internal Affairs Division ("the IAD") and the sufficiency of the disciplinary action taken by the Philadelphia Police Department ("the PPD") in response to complaints of misconduct against police officers were the subjects of a report (the "Report") produced in December 2003 by the Integrity and Accountability Office of the Philadelphia Police Department. (Pl. Ex. D.) The Report followed two extensive studies on the same subject. (Pl. Ex. D at 1.) These prior studies cited serious shortcomings in the Department's disciplinary practices and procedures that compromised the overall integrity of the force. (Id.) One of the Report's conclusions was that "[t]he disciplinary system in the Philadelphia Police Department remains fundamentally ineffective, inadequate, and unpredictable." (Pl. Ex. D at 3.)

Plaintiff also has submitted the expert report of Dr. R. Paul McCauley, in which Dr. McCauley opines that the PPD's investigatory and disciplinary procedures are inadequate. (Pl. Ex.

3

B. at 18.)  In particular, Dr. McCauley states:

> From the materials I have reviewed, the PPD has fallen below the accepted practices of police internal investigatory conduct.  (Id.)
>
> The PPD discipline, as practiced, is incident based rather than progressive.  That means repeat violators are not penalized in proportion to the number of violations. (Id.)
>
> Had the PPD had a reasonable [Early Warning System/Internal Affairs Investigation] as part of an effective disciplinary system, it is more likely than not that Officer Darden, would have been considered for psychiatric evaluation and/or been provided with enhanced supervision, and/or anger management counseling, and/or specialized training including community relations, and/or transferred out of the 35th District. (Id.)
>
> Although the outcomes of [Darden's] Internal Affairs investigations for physical abuse were concluded to be something other than Sustained, he should have been "red flagged" by IAD considering the off-duty criminal charges, his insubordination, and choking of [Lyons]. . . . Simply keeping the tally of complaints against [Darden] is not sufficient. . . . A reasonably trained and competent police administration/IAI manager, more likely than not, would have seen these red flags and taken appropriate action to assist [Darden's] performance.  (Ex. B. at 16-17.)
>
> A global analysis of IA's investigatory procedures indicates a pattern of administrative conduct where the benefit of the doubt is given to the Officer rather than the complainant.  (Ex. B at 15.)
>
> My summary analysis of Darden's IAI files raises concerns as to the quality of the IAI's themselves and the validity of the IAI findings/conclusions. (Ex. B. at 15.)
>
> Had the PPD taken steps to systemically apply both positive and negative discipline, it is more likely than not that Darden's conduct incidents after 2001, including Lyons, would have been  reduced substantially in both frequency and intensity.  (Ex. B. at 11.)

Specifically with respect to the Internal Affairs Investigation into the incident at Olney High School, Dr. McCauley states that the IAD's investigation findings are internally inconsistent, and that if Darden precipitated the confrontation, then he was in fact the aggressor and created the danger to Lyons. (Ex. B. at 6.)  Furthermore, Dr. McCauley opines that the IAD's conclusion would have been

4

different had a reasonably trained and competent investigator considered the citizen complaints filed against Darden, his IAD history, and his disciplinary record. (Id.)

Against this evidence, the City asserts that as part of its investigatory and disciplinary process, the PPD maintains an Internal Affairs Case Management System ("IAPro") that was initiated in 2002. (Def. SMF ¶ 42.) IAPro can display officers by name and complaint summaries, and identify documents associated with an investigation. (Id.) According to the City, IAPro provides officer "alerts" with regard to complaints against a particular officer for use of force, IAD intake information, discharge of firearm investigations, statistical reports and graphs, and Police Board of Inquiry case processing (including notification to chains of command and the tracking of disciplinary case outcomes). (Id.)

  C. <u>Darden's History with the PPD</u>

Darden joined the PPD in 1995. (Def. SMF ¶ 36.) As a police officer, he has made "hundreds of arrest," and has received approximately 10 commendations for his performance. (Def. SMF ¶ 38.) He has also been the subject of at least 9 internal affairs investigations, and at least 5 Police Board Inquiries. (Def. SMF ¶¶ 39, 79-86.) In addition, Darden has completed Use of Force reports 14 times in his 12 years as a Philadelphia police officer. (Def. SMF ¶ 87.) Darden's use of force on 12 of the 14 occasions was "approved" after investigation. (Def. SMF ¶ 88.) One of the 14 incidents remains "open," and the remaining incident was "closed without disposition." (Def. SMF ¶ 89.) The following is a summary of the Internal Affairs investigations and Police Board inquiries in which Darden was involved.[1]

---

[1]At the conclusion of an Internal Affairs investigation, Internal Affairs classifies its report with one of the following categorizations:
  SUSTAINED - Investigation demonstrates that the allegation is true and the action(s)

On May 3, 1996, Darden failed to appear in court. (Def. SMF ¶ 80.) The Police Board conducted an inquiry and Darden was reprimanded. (Id.)

On July 7, 1997, Darden failed to appear in court. (Def. SMF ¶ 81.) The Police Board conducted an inquiry and Darden received a 1 day suspension. (Id.)

On March 8, 1998, Darden, while off-duty, allegedly physically assaulted an individual named Richard King at King's residence. (Def. SMF ¶ 43.) An Internal Affairs investigation (IAD 98-1058) was begun as a result. Following a Police Board inquiry, Darden was terminated by the PPD for conduct unbecoming an officer. (Def. SMF ¶ 44.) Subsequently, Darden petitioned to be reinstated after he was found not guilty of criminal charges stemming from this incident. (Def. SMF ¶ 45.) An independent arbitrator ruled that Darden must be reinstated as a police officer without any supervision or additional training. (Def. SMF ¶ 46.)

On August 8, 2000, Darden arrested an individual named Frederick Rollins for interfering in the arrest of several individuals and knocking handcuffs out of Darden's hands. (Def. SMF ¶ 47.) Rollins filed a complaint alleging use of excessive force and claiming that he suffered a torn rotator cuff and other injuries as a result of being arrested by Darden. (Def. Ex. K) An internal affairs investigation (IAD 01-1147) was conducted. (Id.) Internal Affairs found that Rollins had refused

---

of the officer(s) was inconsistent with department policy, orders and directives and/or applicable local, state or federal law.
NOT SUSTAINED - A thorough investigation can neither prove nor disprove the allegation.
UNFOUNDED - The incident alleged did not occur.
EXONERATED - Although the allegation is true, the conduct of the police is in accordance with accepted Police Departmental policy.
WITHDRAWN - The person(s) making the complaint decided, on his/her own volition to withdraw the complaint.
(Def. SMF ¶ 41.)

to cooperate in the investigation by refusing to be interviewed by the investigator. (Def. SMF ¶ 49.) The investigator conducted several other interviews and a document review, and concluded that the claims against Darden were "unfounded." (Def. SMF ¶ 50.)

On February 18, 2001, Darden arrested an individual named Valgene West for narcotics violations. (Def. SMF ¶ 60.) The arrest followed a foot pursuit and concluded after Darden tackled West. (Def. SMF ¶ 61.) West subsequently filed a complaint alleging that he had been physically abused by Darden. (Def. SMF ¶ 60.) Internal Affairs concluded after an investigation (IAD 01-088) that West had been "less then (sic) honest," and it therefore "exonerated" Darden of the charges against him. (Def. SMF ¶ 62, Def. Ex. M at 414.)

On April 11, 2001, Darden refused to obey an order from a superior officer, failed to comply with the Commissioner's orders, directives, and regulations, and failed to properly patrol his beat or sector, resulting in a 10 day suspension and transfer. (Def. SMF ¶ 83.)

On August 11, 2005, Darden arrested an individual named John Farley for disorderly conduct. (Def. SMF ¶ 64.) Farley filed a complaint claiming that he had been physically abused, verbally abused, and falsely arrested. (Def. SMF ¶ 65.) Internal Affairs conducted an investigation (IAD 05-469). (Pl. Ex. N.) On February 1, 2006, Farley withdrew his complaint. (Def. SMF ¶ 66.) Internal Affairs "exonerated" Darden from the verbal and physical abuse allegations. (Def. SMF ¶ 67.)

As described above, Internal Affairs conducted an investigation into the incident between Lyons and Darden at Olney High School that occurred on January 11, 2006. (Def. SMF ¶ 52.) As a result of this investigation, the matter was sent to the Police Board of Inquiry, which recommended a ten day suspension. (Def. SMF ¶¶ 85-86.)

On March 28, 2006, Darden, while off-duty, observed a theft in progress, pursued the suspects and apprehended them. (Def. SMF ¶ 76.) The suspects were charged with retail theft. (Def. SMF ¶ 77.) Darden's actions were approved and determined to be in accordance with Departmental policy. (Def. SMF ¶ 78.) Internal Affairs did not conduct an investigation into this incident. (Pl. SMF ¶ 78.)

On April 7, 2006, Darden and his partner stopped an individual named Alicia Smith-Allen for traffic violations. (Def. SMF ¶ 68.) Smith-Allen filed a complaint against Darden and his partner asserting that they had harassed and discriminated against her and that the traffic stop had been racially motivated. (Def. SMF ¶ 69.) Internal Affairs conducted an investigation (IAD 06-180), which included a review of both officers' Internal Affairs files for a history of racial profiling. (Def. SMF ¶ 71.) It ultimately concluded that Smith-Allen's allegations that the officers had treated her unprofessionally and harassed her because she was a black female were "unfounded." (Def. SMF ¶ 70.)

On May 23, 2006, an individual named John Roberts alleged that Darden had physically and verbally abused him. (Def. SMF ¶ 74.) This investigation (IAD 06-365) is still open. (Def. SMF ¶ 75.)

On February 5, 2007, Internal Affairs received an email regarding alleged improprieties by Darden and his partner. (Def. SMF ¶ 56.) The complaint alleged that the officers were drinking beer at a party while on duty. (Def. SMF ¶ 57.) The individual who sent the email admitted during his interview that he was not present when the photographs were taken, and that he had fabricated the caption on the email, which stated that the officers were called to the location for a noise complaint, but instead stuck around for a few beers. (Def. SMF ¶ 58.) As a result of an investigation (IAD 07-

1019), Internal Affairs concluded that the allegations in the email were "unfounded." (Def. SMF ¶ 59.)

The City maintains that the PPD has disciplined Darden for any actions that did not comply with police procedures and directives, and that Darden's supervisors "worked extensively with [him] trying to address the deficiencies which [they had] observed. This has included numerous training/counseling sessions and various assignment changes." (Def. SMF ¶¶ 79, 84; Def. Ex. U at 000367.) However, Plaintiff maintains that the PPD has failed to take meaningful disciplinary or remedial action despite a documented record of misconduct complaints that should have red-flagged Darden well before the incident at Olney High School. (Pl. SMF ¶ 84; Pl. Ex. B.)

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving

party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In evaluating the evidence, we take the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Technologies, Inc., 78 F. Supp. 2d 402, 407 (E.D. Pa. 2000). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. AEV, Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).

**IV.   DISCUSSION**

The City raises several arguments in its Motion for Summary Judgment. First, the City argues that the undisputed evidence establishes that Darden was not acting under color of state law at the time of the incident, and that, consequently, there can be no municipal liability pursuant to § 1983. The City also contends that Plaintiff has failed to adduce competent evidence to support a finding of municipal liability in accordance with Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978), and its progeny. Specifically, the City asserts that Plaintiff cannot demonstrate that it is liable under the failure to train, discipline, or supervise theories, and that she cannot demonstrate deliberate indifference on the part of policymakers, or that the City's policies or customs caused a

violation of her constitutional rights. These arguments are without merit.

    A.    <u>Color of State Law</u>

To establish a claim under § 1983, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995), <u>cert. denied</u>, 516 U.S. 858 (1995) (quoting <u>Moore v. Tartler</u>, 986 F.2d 682, 685 (3d Cir. 1993)). To act "under color of state law" means to "exercise[] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." <u>Barna v. City of Perth Amboy</u>, 42 F.3d 809, 815-16 (3d Cir. 1994) (quotation and citation omitted). Acts of a state or local employee in his or her official capacity will generally be found to have occurred under color of state law. <u>Id.</u> at 816. Additionally, acts by a person who is without actual authority, but who purports to act according to official power, may also be acts under color of law. <u>Id.</u> Although police officers are undoubtedly state actors, <u>see</u> <u>Abbott v. Latshaw</u>, 164 F.3d 141, 146 (3d Cir. 1998), "a police officer's purely private acts which are not furthered by any actual or purported state authority are not acts under color of state law." <u>Barna</u>, 42 F.3d at 816.

There is no dispute that, at the time of the incident at Olney High School, Darden was on-duty and in uniform as a Philadelphia Police Officer. The City contends, however, that Darden went to Olney High School on January 11, 2006 for the purely personal reasons of retrieving a jacket from Plaintiff's partner, and not in furtherance of any law enforcement objective or official police purpose. The City further asserts, <u>inter alia</u>, that Darden entered the school without incident, that he did not have the authority to detain, restrain, or arrest Plaintiff inside the high school, that he did not at any time attempt to handcuff Plaintiff, and that his actions were not made possible by his authority as

11

a Philadelphia police officer. Therefore, the City claims that Darden did not act under color of law.

In response, Plaintiff points to evidence that at the time of the incident, Darden used his authority as a police officer to enter a secure location, i.e., the security office at Olney High School, even though he was not assigned to be at that location. (Pl. Ex. A, Lyons Aff. ¶ 3.) More importantly, Plaintiff presents evidence that when bystanders tried to intervene and prevent the attack, Darden stated, "Don't touch me I am a cop," and when bystanders tried to move Darden away, he continued his attack and told bystanders, "Get out of my way, I am a cop." (Id.)

This evidence, if believed by a jury, is sufficient to show that Darden was acting under color of state law at the time of the incident, regardless of whether he was present for the personal reason of obtaining a jacket. See Barna, 42 F.3d at 816 ("'If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity.'" (quoting Griffin v. Maryland, 378 U.S. 130, 135 (1964))). Thus, the City's contention that we can find as a matter of law based on undisputed evidence that Darden was not acting under color of state law is in error and we cannot grant summary judgment to the City on that basis.[2]

B.   Municipal Liability Under Monell and Its Progeny

A municipality can only be liable under § 1983 when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. Monell, 436 U.S. at 694. A municipal policy is defined as "'a statement, ordinance, regulation, or decision officially adopted and promulgated by [a local

---

[2] Because we have found that there are genuine issues of material fact regarding whether Darden was acting under color of law, we need not address the City's related contention that, because Darden was not acting under color of law, there can be no municipal liability.

governing] body's officers.'" Simmons v. City of Philadelphia, 947 F.2d 1042, 1059 (3d Cir. 1991) (quoting Monell, 436 U.S. at 691) (alterations in Simmons). A municipal custom consists of "'such practices of state officials . . . [as are] so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" Simmons, 947 F.2d at 1059 (quoting Monell, 436 U.S. at 691) (alterations in Simmons).

Once a policy or custom is identified, a plaintiff must establish that the municipality maintained the policy or custom with "deliberate indifference" to the constitutional deprivations that the policy or custom caused. City of Canton v. Harris, 489 U.S. 378, 389 (1989); see also Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996) (stating that the "deliberate indifference" standard, though originally created in the context of a failure to train claim, has been applied to other claims of municipal liability based on policy or custom). Deliberate indifference may be established by evidence that policymakers were aware of the constitutional deprivations and of the alternatives for preventing them, but either deliberately choose not to pursue these alternatives or acquiesced in a long-standing policy or custom of inaction in this regard. Simmons, 947 F.2d at 1064; see also Board of County Comm'rs v. Brown, 520 U.S. 397, 407 (1997) ("If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability.").

In addition, a plaintiff must also prove that the municipal policy or custom was the proximate cause of the injuries suffered. Beck, 89 F.3d at 972 n.6. The United States Court of Appeals for the

13

Third Circuit has explained that "[a] sufficiently close causal link between . . . a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990). "Typically, '[a]s long as the causal link [between the alleged policy or custom and the constitutional injury] is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.'" Watson v. Abington Twp., 478 F.3d 144, 157 (3d Cir. 2007) (citing Bielevicz, 915 F.2d at 851).

Based on this law, to establish her Monell claim, Plaintiff must demonstrate that the City's internal police investigatory and disciplinary policies and practices exhibit a deliberate indifference to the risk of police officers using excessive force, and that the City's action (or inaction) caused Plaintiff's constitutional injury in this case. While the City contends that Plaintiff has failed to adduce competent evidence to support her Monell claim, we find that this argument is without merit.

First, with respect to a policy or custom exhibiting deliberate indifference on the part of policymakers, Plaintiff has submitted the Report from the Integrity and Accountability Office, Dr. McCauley's expert report, and Darden's history with the PPD. The Report concluded in part that "[t]he disciplinary system in the Philadelphia Police Department remains fundamentally ineffective, inadequate, and unpredictable." (Pl. Ex. D at 3.) Similarly, Dr. McCauley's expert report concluded, inter alia, that the PPD's investigatory and disciplinary procedures are inadequate, and further stated that a review of the IAD's investigations into Darden's behavior raised doubts regarding the validity of the IAD's conclusions with respect to complaints against Darden himself. Darden's history with the PPD shows that he has been the subject of four complaints for excessive force in addition to the

14

instant incident, one investigation into an alleged off-duty assault which resulted in criminal charges being filed against him, and charges of insubordination and neglect of duty. This evidence regarding the sufficiency of the internal investigations and the disciplinary system along with the number of complaints for misconduct against Darden could certainly lead a reasonable jury to conclude that the City was deliberately indifferent to the systemic deficiencies in the internal investigatory and disciplinary mechanism of the PPD and to the risk that these deficiencies would result in violations of citizens' rights.

With respect to causation, Plaintiff relies on the expert report of Dr. McCauley in which he concludes that had the PPD had a reasonable early warning system and internal investigatory process as part of its overall disciplinary system, Darden would likely have been considered for psychiatric evaluation and/or provided with enhanced supervision, anger management counseling, or specialized training. (Pl. Ex. B at 18.) Dr. McCauley also states that "[h]ad the PPD taken steps to systemically apply both positive and negative discipline, it is more likely than not that Darden's conduct incidents after 2001, including Lyons, would have been reduced substantially in both frequency and intensity." (Pl. Ex. B at 11.) Based on this evidence, a jury could reasonably conclude that the City's alleged policy and practice of ignoring systemic deficiencies in the investigatory and disciplinary mechanism of the PPD was the proximate cause of the injuries sustained by Plaintiff during the incident at Olney High School. Consequently, we find that there are genuine issues of material fact that preclude us from awarding the City summary judgment on Plaintiff's Monell claim.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIMBERLY LYONS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA AND | : | |
| SHANE DARDEN | : | NO. 06-5195 |

**ORDER**

    **AND NOW**, this 12th day of October 2007, upon consideration of the City of Philadelphia's Motion for Summary Judgment (Docket No. 30), and Plaintiff's response thereto, and following the oral argument held on October 4, 2007, **IT IS HEREBY ORDERED** that Plaintiff's Motion is **DENIED**.

                                                              BY THE COURT:

                                                               s/ John R. Padova, J.
                                                               John R. Padova, J.